Jerry Mike BELL *v.*
ITEK LEASING CORPORATION

77-84                                                   555 S.W. 2d 1

Opinion delivered July 11, 1977
(In Banc)
[Rehearing denied September 19, 1977.]

*Robert S. Blatt,* for appellant.

*Bethell, Callaway & Robertson,* by: *Bruce H. Bethell,* for appellee.

GEORGE ROSE SMITH, Justice. In this case, essentially one of first impression in Arkansas, the single issue is whether a contract by which Itek Leasing Corporation purported to lease certain printing equipment to Jerry Mike Bell for a term of five years was in actuality an installment-sale contract carrying such an excessive interest rate as to be void for usury under Arkansas law. We are unanimously of the opinion, contrary to the trial court's conclusion, that the overwhelming preponderance of the proof shows the purported lease to have been in fact a credit sale that is void for usury. We therefore reverse the decree on direct appeal and do not reach the cross appeal.

In 1968 we examined in detail a transaction that was argued on the one hand to be a sale and on the other to be a lease. *Sawyer v. Pioneer Leasing Corp.,* 244 Ark. 943, 428 S.W. 2d 46 (1968). There the distinction was important only with regard to the existence of an implied warranty; the issue of usury was not presented. Nevertheless, in language that we adhere to, we made prophetic observations that have proved to be peculiarly pertinent to the present case:

> [W]e think it well to point out that agreements of this nature will be examined closely by this court. It is possible that similar agreements could be used to cloak usurious charges, *i.e.,* a transaction which was actually a sale could be set up as a lease in order to enable charges to be made that would, under a credit sale, constitute usury.

Our prediction in that case has come true.

In 1973, five years after the *Sawyer* decision, the plaintiff Bell and a salesman for Micro-Graphics (a North Little Rock

company) completed at Bell's home in Fort Smith the controverted contract for the "leasing" by Bell of certain printing equipment. The salesman filled out the printed form, and Bell signed it. Apparently the contract was next signed about six weeks later by the defendant, Itek Leasing Corporation, whose mailing address is Rochester, New York. The contract recites that it is to be governed by New York law, but there is no contention that Arkansas law is not controlling under Ark. Stat. Ann. § 27-2504 (Supp. 1975), as construed in *Deposit Guaranty Nat. Bk.* v. *River Valley Co.*, 247 Ark. 226, 444 S.W. 2d 880 (1969).

The contract recites that the equipment's *price* (an odd word to use in a lease) is $12,670. The "lessee" makes an "initial payment" of $1,498.05 and agrees to make 60 additional monthly payments of $299.61 each. Itek made no effort to explain how the amount of the monthly payments was arrived at, but if they are actually remittances upon a credit sale of the equipment for the recited price less the down payment, then the contract provides an interest return to the seller at the rate of 19.31% a year. Under our Constitution such a contract is void.

We do not discuss at length either the facts or the controlling rule of law, for in this case both are beyond dispute. A "lease" is a security interest under the Uniform Commercial Code (or at common law) if "the deal is in every respect a secured installment sale except that the parties clothe it in lease terminology." White & Summers, Uniform Commercial Code, § 22-3 (1972); *Burroughs Adding Mach. Co.* v. *Bogdon,* 9 F. 2d 54 (8th Cir. 1925); *McKeeman* v. *Commercial Credit Equipment Corp.*, 320 F. Supp. 938 (E.D. Neb. 1970); *McGalliard* v. *Liberty Leasing Co. of Alaska*, 534 P. 2d 528 (Alaska, 1975).

Upon the facts, five important points are plainly established by the proof or plainly to be inferred from the proof:

First: The defendant, Itek Leasing Corporation, is in fact a finance company. Although the main items that were covered by the contract were an "Itek Mark IV Platemaster" and an "Itek Duplicator," the leasing company does not, in

the words of its own witness, manufacture any equipment of any nature. It is a service company that has outstanding about 1,300 leases representing (an investment of) about eighteen million dollars. It is fair to infer that Itek Leasing Corporation finances the sale of Itek products.

Second: The printed form of lease puts all the risk upon the lessee, not upon the lessor. The lessee must pay the taxes and insurance upon the leased property and incurs, in the most detailed language, every risk of loss or damage to the leased property.

Third: The contract provides the same remedies upon the lessee's default in the payment of rent, even at the end of the first month, that would be available to a conditional seller or to a mortgagee upon a similar delinquency. That is, the lessor can declare all the remaining payments to be due, can repossess the property, can sell it, and can hold the lessee personally liable for any deficiency. Thus the lessee may be held responsible for rent not even due for another four years or more if the property does not sell for enough to pay all future rents. We can recall having seen no bona fide lease containing such a remedy.

Fourth: The contract expressly provides that the lessee will, upon the lessor's request, join the lessor "in executing financing statements pursuant to the Uniform Commercial Code and in the execution of such other instruments or assurances as Lessor deems necessary or advisable for . . . the protection of . . . the interest of the Lessor in the Equipment." The Uniform Commercial Code, which the contract itself cites, provides that a lease is not a security interest and therefore not within the purview of the Code unless it is intended as a security. Ark. Stat. Ann. §§ 85-1-201 (37) and 85-9-102 (2) (Add. 1961). Here the contract not only required Bell to execute a financing statement upon request; such a statement was in fact demanded and filed. Itek Leasing is not in a position to contend that it had no thought that the lease was actually a security device.

Fifth: The authorities, *supra*, put great emphasis on the amount (in percentages) that the "lessee" must pay to ac-

quire title after all the payments have been made. If the amount is nominal (10% is a figure frequently so described), then the transaction is patently a sale in lease's clothing; for why would a bona fide lessor relinquish a valuable chattel for next to nothing? That question arises here. Itek Leasing's witness, testifying in its own behalf, said that his company, about 30 days before the expiration of the five-year term, would have offered Bell the option (had he made all the preceding payments) of buying the equipment for 10% of its original contract price. During those five years. Bell would have paid a total of more than $17,500 for the "rental" of equipment that had an initial value of $12,670 and which, according to the indications in the record, would still have been worth $10,000 at the expiration of the 5-year lease. Obviously Bell would have had no real choice except to pay another $1,-267 to protect, to salvage, an investment of more than $17,000 in equipment still worth some $10,000.

In reversing the decree we think it fair to say that Itek Leasing is not shown to have deliberately sought to circumvent our usury law by a transparently fraudulent scheme. Rather to the contrary, it seems to have used a printed contract form that may be valid in New York and other jurisdictions, and to have presented its case with candor. In Arkansas, however, the terms of this contract unquestionably run counter to our constitutional provision against usury, which we have consistently and vigorously enforced for many years.

Reversed and remanded for further proceedings.

Supplemental opinion on denial of rehearing
delivered September 19, 1977
(In Banc)

GEORGE ROSE SMITH, Justice. The appellee, in its petition for rehearing and supporting brief, continues to argue in effect that the so-called lease should be construed according to its form rather than its substance. It is settled, however, that if a transaction, such as a purported sale, is actually a mere device to cover the exaction of usurious interest, the form of the transaction is immaterial. *Home Bldg. & Sav. Assn.* v. *Shotwell,* 183 Ark. 750, 38 S.W. 2d 552 (1931). In the case at bar the transaction between the appellant and the appellee was plainly a credit sale, even though the finance company attempted to disguise its role as that of a lessor.

On rehearing counsel for the appellee for the first time call our attention to a 1973 amendment to the Uniform Commercial Code, contained in Act 116 of 1973. Ark. Stat. Ann. § 85-9-408 (Supp. 1975). The new section provides that a consignor or lessor of goods may file a financing statement, but the filing shall not of itself be a factor in determining whether the consignment or lease is intended as security. The intent of the amendment is to permit a lessor, for example, to file a financing statement as a precautionary measure, even while contending that the lease is a true lease for which no financing statement is actually required.

The 1973 Act does not affect our decision in this case, for two reasons. First, by its terms the statute did not take effect until January 1, 1974, which was after this financing statement had been accepted and presumably filed. Second, in Arkansas whether a transaction is usurious is a question arising under the Constitution, Art. 19, § 13, and is therefore for the courts rather than for the legislature. As we noted in *Strickler* v. *State Auto Finance Co.,* 220 Ark. 565, 249 S.W. 2d 307 (1952): "[T]he lawmakers are powerless to declare that a usurious charge is not to be so considered by the courts."

Counsel also question the statement in our original opinion that the equipment, "according to the indications in the record, would still have been worth $10,000 at the expiration of the 5-year lease." At the close of the trial, counsel for the appellant, in asking that the appellee be required to give security to protect the appellant pending the appeal, stated without contradiction that at a pretrial conference it had been decided by attorneys for both sides and by the court that a reasonable value of the property was $10,000. The appellee in fact filed a bond in that amount. There is also a showing that as of September 10, 1975, when only 55% of the purchase price was still unpaid, the appellee itself offered to execute a bill of sale to the appellant for $8,950, which was 70% of the original purchase price. Hence according to the record the $10,000 figure, at least as of the date of the trial, appears to be a fair one. The actual figure, however, is not of much importance, the point being that in any event the value at the termination of the lease would apparently be far in excess of the 10% payment by which the "lessee" could acquire the property.

Rehearing denied.